IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| DEBORAH LARKIN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 09-4146 |
| | : | |
| METHACTON SCHOOL DISTRICT, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |

**MEMORANDUM**

YOHN, J.                                                      February 23, 2011

Deborah Larkin brings this action against the Methacton School District (the "District"), alleging claims of discrimination and retaliation in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. §§ 951 *et seq.* Larkin, a recovering alcoholic, claims that the District unlawfully discriminated against her because of her disability or perceived disability by (a) denying transfers to elementary-school positions for which she was qualified and (b) failing to provide a reasonable accommodation for her disability. She also claims that the District unlawfully retaliated against her for requesting a reasonable accommodation and filing a grievance regarding the District's handling of her request.[1] Currently before the court is the District's motion for summary judgment under Federal Rule of Civil Procedure 56. For the

---

[1] Larkin does not delineate her claims in separate counts.

1

reasons set forth below, I will grant the District's motion as to each of Larkin's claims.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

Larkin was hired by the District in November 2000 as a physical-education and health teacher at Methacton High School. (Def.'s Statement of Uncontested Facts ("Def.'s Facts") ¶ 7.) In March 2007, Larkin told District officials that she was an alcoholic. (Def.'s Facts ¶ 23.) According to Larkin, the District did not change the way it treated her after learning that she was an alcoholic, and there is no indication that her alcoholism was affecting her ability to do her job. (Def.'s Facts ¶¶ 24–25, 29.)

### A.      The February 8, 2008, Incident

On February 8, 2008, however, after drinking the night before, Larkin arrived at school drunk and drank a full bottle of cough syrup to satisfy her craving for alcohol. (Pl.'s Supplemental Statement of Material Facts ("Pl.'s Supp'l Facts") ¶ 1; Def.'s Facts ¶¶ 34–35.) After confronting her, District officials required that she go to the hospital for a blood-alcohol test. (Pl.'s Supp'l Facts ¶ 7; Def.'s Mot. for Summ. J. Ex. H.) According to the test results, Larkin's blood-alcohol level was 0.266 that afternoon (Def.'s Facts ¶ 37), more than three times the legal driving limit.

As a result of this incident, Larkin was suspended with pay for four days. In a letter dated February 11, 2008, Lawrence Feeley, who was then the District's acting director of labor relations and human resources, and Barbara Stevenson, who was then the superintendent of the

---

[2] Except as otherwise noted, the following facts are undisputed or reflect the plaintiff's evidence.

District, informed Larkin of the suspension and explained that she would be allowed to return to work if she (a) contacted the District's employee assistance program or a similar resource and scheduled at least two counseling sessions during the week of her suspension and (b) scheduled an appointment, upon her return to work, with the District to review her "plan of action for the remainder of the 2007–2008 school year." Feeley and Stevenson also explained that, before she returned to work, Larkin had to submit a copy of the results of her blood-alcohol test. (Pl.'s Supp'l Facts Ex. 36.)

Meanwhile, on February 9, Larkin checked herself into the Caron Treatment Center ("Caron") for treatment for alcoholism. (Def.'s Facts ¶ 46; Pl.'s Supp'l Facts ¶ 30.) Larkin stayed at Caron for thirty days; upon her discharge, she continued to receive out-patient treatment and attended daily Alcoholics Anonymous ("AA") meetings. (Pl.'s Resp. to Def.'s Statement of Uncontested Facts ("Pl.'s Resp. to Def.'s Facts") ¶ 47.)

After Larkin checked herself into Caron, her primary-care physician, Dr. Birgit Wiswe, informed the District that Larkin was "under a Doctor's care and [would] be out of work for a minimum of one month." (Pl.'s Supp'l Facts Ex. 11.) Dr. Wiswe sent the District letters again on March 10, April 10, and May 12, each time explaining that Larkin remained under a doctor's care and would be out of work for an additional month. (Def.'s Mot. for Summ. J. Ex. J.)

## B. Larkin's Request for a Transfer

On March 12, Larkin informed the District that she wanted to transfer to another school (Compl. ¶ 20), and in a March 25 e-mail, Feeley asked Larkin to contact him to discuss the possibility of her return to Methacton High School during that school year as well as her request for a transfer for the following school year (Def.'s Mot. Summ. J. Ex. K).

Larkin met with Feeley, Stevenson, and Diana Kernop, the president of the Methacton Education Association, on April 23. (Pl.'s Supp'l Facts ¶ 34.) Larkin explained that she could not return to the high school and was requesting a transfer because she needed to avoid the "people, places, and things" associated with her drinking. (Def.'s Mot. for Summ. J. Ex. A, Dep. of Deborah Larkin (Mar. 9, 2010) ("Larkin Dep.") at 129:2–20; Pl.'s Supp'l Facts ¶ 37.) She believed that the student population at the high school "was a threat to her health and her ability to remain sober." (Pl.'s Supp'l Facts ¶ 36.) According to Larkin, Stevenson understood Larkin's need to transfer and empathized with her because Stevenson's ex-husband was an alcoholic. (Larkin Dep. at 128:17–130:6; Pl.'s Supp'l Facts ¶¶ 35, 37.) Stevenson and Feeley told Larkin, however, that if she wanted to transfer, she would have to apply for an open position at another school and be interviewed for that position, and Larkin understood; there was no discussion about Larkin being transferred without participating in the normal application process. (Larkin Dep. at 129:11–15, 130:19–131:6; Def.'s Facts ¶ 53.)

After Larkin left the meeting, Kernop asked—as an afterthought, as she put it—whether the ADA applied to Larkin's situation. (Pl.'s Supp'l Facts Ex. 15, Dep. of Diana Kernop (Apr. 15, 2010) ("Kernop Dep.") at 45:16–47:7.) Kernop said that she would check with the union's legal counsel, and the District administrators said that they would check with the District's counsel. (*Id.* at 46:10–47:2.) According to Kernop, later that day she sent e-mails to Feeley and Stevenson informing them that the union's counsel believed that the ADA did apply, but the District officials never indicated to her whether they believed that the ADA applied. (*Id.* at 48:2–51:14.)

### 1.    The Audubon Position

An opening for a health and physical-education position at Audubon Elementary School had been posted a couple of days before this April 23 meeting (Pl.'s Supp'l Facts Ex. 21), and on April 24, the day after the meeting, Larkin e-mailed her resume to Feeley to apply for the position (Def.'s Facts ¶ 54; Pl.'s Supp'l Facts ¶ 68).

Larkin was interviewed for the Audubon position on April 29 by Melissa Gorla, who was then the principal of the elementary school. (Def.'s Facts ¶ 69; Pl.'s Supp'l Facts ¶ 69.) Gorla also interviewed another candidate, Donica Godri, who at the time was working as a health and physical-education teacher in a split position at two other elementary schools in the District. (Def.'s Facts ¶ 72; Compl. ¶ 30.) Both candidates were asked the same set of questions. (Def.'s Facts ¶ 73; Def.'s Mot. for Summ. J. Ex. W, Deposition of Melissa Gorla (Mar. 3, 2010) ("Gorla Dep.") at 16:9–16.) According to Gorla, she selected Godri, instead of Larkin, for the position because Godri was the "best candidate"—not only did she have elementary-school experience within the District, but, according to Gorla, "she was very energetic and gave a positive outlook of working with young children." (Gorla Dep. at 16:20–17:17; Def.'s Facts ¶ 74.) Gorla testified that Larkin told her she (Larkin) was a recovering alcoholic but that Larkin's status did not affect her decision in any way. (Gorla Dep. at 26:19–28:9; Def.'s Facts ¶ 75.)

### 2. The Split Position

Godri's transfer to Audubon meant that her split position as a health and physical-education teacher at Arrowhead and Worcester Elementary Schools was available. (Compl. ¶¶ 30–31.) After the District posted the opening on May 1 (Pl.'s Supp'l Facts Ex. 24), Larkin applied for that position (Def.'s Facts ¶ 78). On May 13, she e-mailed Feeley to explain that she

was applying for the position "as a reasonable accommodation as a recovering alcoholic under the ADA." (Def.'s Mot. for Summ. J. Ex. M.) Larkin did not object, however, to the fact that she was being required to interview for the position. (Def.'s Facts ¶ 81.)

Around this time, Larkin's therapists and primary-care physician sent letters to Feeley recommending that the District transfer her to another school. (Def.'s Mot. for Summ. J. Ex. N.) None of them mentioned a transfer to an elementary school specifically, and although they recommended and supported a transfer, none suggested that it was necessary. Dr. Wiswe, for example, wrote that she, "along with other health care professionals, [had] strongly encouraged [Larkin] to apply for transfer to another school . . . to support her efforts in regards to maintaining sobriety." (*Id.* Ex N., Letter from Birgit Wiswe to Larry Feeley (May 9, 2008).) One of Larkin's therapists asserted that "Larkin remains very competent in every way to continue teaching" and that "[a] change in her school environment will give her new opportunity to utilize the tools she's learned in the course of her treatment and to exercise her teaching skills and talents in a new environment with a different student population and different collegial support." (*Id.* Ex. N, Letter from Mary McCormick to Larry Feeley (May 7, 2008).) Another therapist noted that Larkin "appears to be using good judgment in her request for sick time and a transfer to another school with a different position, in order to reduce stress related to her work." (*Id.* Ex. N, Letter from Maryanne Bosio to Larry Feeley (May 7, 2008).)

Larkin was interviewed for the split position by Bruce MacGregor, the principal of Worcester Elementary School, and Dan Petino, the principal of Arrowhead Elementary School, on May 13. (Def.'s Facts ¶¶ 87–89.) The interview lasted about twenty to twenty-five minutes (Def.'s Facts ¶ 100) and, according to Larkin, was interrupted on two separate occasions, each

time for several minutes—first, when a secretary came in to leave a message for the individual in whose office the interview was being conducted, and second, when that individual came into the office to retrieve her computer and the message left by her secretary (Compl. ¶ 35; Def.'s Facts ¶¶ 99, 101). Larkin asserts that on both occasions MacGregor and Petino engaged in conversation with the person who came into the office, "ignoring the fact that they were in the middle of conducting an interview." (Compl. ¶ 35.)

During the interview, Larkin told MacGregor and Petino that she was a recovering alcoholic, but both MacGregor and Petino testified that that did not affect their view of her as a candidate for the position. (Def.'s Facts ¶ 96; Def.'s Mot. for Summ. J. Ex. X, Dep. of Bruce MacGregor (Mar. 4, 2010) ("MacGregor Dep.") at 20:11–21:11; *id.* Ex. Y, Dep. of Daniel J. Petino (Mar. 4, 2010) ("Petino Dep.") at 25:2–26:4.) MacGregor testified that he thought that Larkin's responses were "average" and that he "wasn't satisfied that she was . . . the best candidate we could get for the job," because she had high-school experience but not elementary-school experience. (MacGregor Dep. at 22:6–7, 22:24–23:5.) Petino did not think that Larkin was a "good fit for the elementary school" (Petino Dep. at 33:11–12) and explained that she did not exhibit the "[h]igh energy, enthusiasm, love for the job" (*id.* at 29:17–21), or "experience working in an elementary school" that he was looking for (*id.* at 33:14–19). Accordingly, MacGregor thought that additional candidates should be interviewed for the position (MacGregor and Petino had not yet interviewed anyone else for the position). (MacGregor Dep. at 36:2–16.)

The next day, Feeley told Larkin that she did not receive the position because she was not a "good fit." (Pl.'s Supp'l Facts ¶ 92.)

Two weeks later, MacGregor and Petino interviewed several other candidates for the split position. These candidates (with one exception) were also interviewed by Feeley and Jeff Jacobs, a teacher at Worcester Elementary School and the health and physical-education coordinator for the Methacton elementary schools—although neither Feeley nor Jacobs had interviewed Larkin. (Pl.'s Supp'l Facts ¶¶ 94–95, 100–101; *id.* Ex. 28.)

The interviewers used standard evaluation forms provided by the District's human-resources department to evaluate all the candidates—including Larkin. But, for reasons that are not clear, the form used to evaluate Larkin used a different point scale (74 points compared with 64 points). (Def.'s Facts ¶¶ 92–93; Pl.'s Supp'l Facts ¶¶ 102–104; *id.* Ex. 28.) (The forms used by Gorla when she interviewed Larkin and Godri for the Audubon position used a 100-point scale. (Def.'s Mot. for Summ. J. Ex. L; Pl's Supp'l Facts Ex. 28.))

MacGregor, after discussing the candidates with Petino, ultimately recommended that Linda Seibert be hired for the split position. (MacGregor Dep. at 40:3–23.) At the time, Seibert was serving as a substitute teacher for Larkin at the high school. (Compl. ¶ 38.) She had been a full-time physical-education teacher at the elementary-school level for three years and had also worked as a substitute physical-education teacher in the District for four years. (Def.'s Facts ¶ 108.) Although Feeley had scored Seibert the highest, Seibert was not the highest overall scorer; rather, she was ranked second overall. (Pl.'s Supp'l Facts Ex. 28.) Nonetheless, in his deposition Petino said that Seibert "made more of an impression" on him and that he "thought she could do a better job"—although he could not explain why she had not scored better if that was the case. (Pl.'s Supp'l Facts Ex. 26, at 47:11–49:1.)

No other elementary-school positions in the District became available, and Larkin did not

seek any other accommodation. (Pl.'s Supp'l Facts ¶ 110; Def.'s Facts ¶ 109.)

On June 25, Kernop, on behalf of Larkin, filed a grievance with the District regarding the District's transfer denials. (Def.'s Mot. for Summ. J. Ex. CC.)

### C. The District's Formal Response to Larkin's Accommodation Request

In a letter dated June 26, 2008, Feeley formally responded to Larkin's request for a transfer as a reasonable accommodation under the ADA. (Def.'s Mot. for Summ. J. Ex. P.) Feeley noted that Larkin was "entitled to apply for any vacant position in the District for which [she was] qualified and eligible" and that her "application [would] be given all due consideration." (*Id.* at 1.) Feeley, asserted, however, that, given the information available to the District, "the District does not believe that your circumstances require that the District provide such an accommodation under the ADA nor do we believe that such action would be 'reasonable' in any event." (*Id.*) In the District's view, Larkin was not disabled within the meaning of the ADA:

> [S]imply because you may possess a medical or psychological condition does not necessarily mean you have a "disability" as defined by the law. To have a disability for which reasonable accommodations are required under the ADA, you must have a physical or mental impairment that substantially limits a major life activity. . . .
>
> . . . [W]e have not been provided any information that delineates any functional limitations as to any major life activities imposed upon you by your condition.

(*Id.*) Feeley asserted that even if Larkin were disabled, the requested accommodation did not appear necessary:

> [T]here is no indication how this requested change in your assignment will actually enable you to overcome any limitation specifically caused by your disability . . . . In effect, your request appears to reflect an accommodation of your preferences rather than an accommodation of your disability.

(*Id.* at 2.) Feeley further asserted that even if Larkin were disabled and her requested

"reassignment could be shown to actually accommodate" her disability, the accommodation was

not reasonable, because it would impose "an undue hardship" on the District:

> Essentially your request would cause the District to bypass its normal hiring processes, thus usurping the District's managerial prerogatives and the rights and expectations of your fellow teachers. It would cause the District to unilaterally assign you to a position that you have never taught before instead of selecting other more qualified and/or experienced teachers. To do so would be inconsistent with the District's goal of placing the best candidate in each position . . . .

(*Id.*)[3] Feeley, however, said that he remained open to further discussions and expressed a

willingness to reconsider the District's conclusion if Larkin provided additional information:

> We are more than willing to continue to discuss this matter further with you. If you have any information that you believe would cause the District to arrive at a different conclusion, or that might assist the District in addressing your actual needs, please feel free to contact me at your convenience.

(*Id.*)

### D.     Larkin's Evaluation: The Unsatisfactory Rating

Meanwhile, at the end of the school year, the District issued teacher evaluations and gave

Larkin a rating of "unsatisfactory." (Def.'s Mot. for Summ. J. Ex. G.) District officials signed

Larkin's evaluation on June 26 (*id.*), but, unlike other teachers, Larkin did not receive it until

sometime in July (Pl.'s Supp'l Facts ¶ 115).[4] Larkin asserts that at least one teacher received his

---

[3] Contrary to Feeley's suggestion in the letter, Larkin did have some elementary-school experience. At his deposition, Feeley admitted that his statement in the letter was inaccurate. (Pl.'s Supp'l Facts ¶ 66.)

[4] Larkin has certified that she did not receive her evaluation until July 24 (Pl.'s Supp'l Facts Ex. 1, Certification of Deborah J. Larkin ("Larkin Certification") ¶ 12), but her complaint alleges that she and Kernop met with District officials on July 8 to discuss her evaluation

evaluation in early June (Pl.'s Supp'l Facts ¶ 115), contrary to the District's contention that all of the teacher evaluations were prepared at the same time (Def.'s Facts ¶ 43). Judith Landis, the principal of Methacton High School, testified that all of the evaluations were late that school year, attributing the lateness, at least in part, to the fact that she was new that year. (Def.'s Mot. for Summ. J. Ex. EE, Deposition of Judith Landis (Mar. 3, 2010) ("Landis Dep.") at 40:15–41:13.) Landis also suggested that she may have taken additional time in preparing Larkin's evaluation and sought guidance from others as to how to handle what she "perceived to be a very difficult situation." (*Id.* at 38:9–40:2.)

On July 14, Kernop, on behalf of Larkin, filed a grievance with the District regarding Larkin's unsatisfactory rating. Kernop requested that the District remove the unsatisfactory rating, asserting that Larkin had been suspended with pay for four days as a result of the February 8 incident and had "more than met the conditions of the February 11, 2008 letter." (Def.'s Mot. for Summ. J. Ex. CC.)

### E. Subsequent Communications with the District

Robert Harney succeeded Feeley as director of labor relations and human resources on July 1. (Def.'s Facts ¶ 2.) On July 9, anticipating Larkin's return to her teaching position at Methacton High School, Harney sent Larkin a letter inviting her to meet with him and Landis to "address any obstacles or concerns [she might] have and to discuss how [he and Landis might] assist [her] in overcoming them so that [she would] be successful in [her] assignment." (Def.'s Mot. for Summ. J. Ex. Q.) According to Landis, the purpose of the proposed meeting was to

_____

(Compl. ¶ 52). In addition, the grievance report filed by Kernop on July 14 stated that Larkin received the evaluation on July 8. (Def.'s Mot. for Summ. J. Ex. CC.)

discuss the plan that had been developed for Larkin's return to the high school, including what Landis and District officials "were looking to do in order to help assist her." (Pl.'s Supp'l Facts Ex. 8, at 71:18–72:2; *see also id.* at 67:10–20.) Shortly thereafter, a meeting was scheduled for July 24.

In e-mail correspondence attempting to schedule the meeting, Harney noted that the performance plan that Larkin had received along with her evaluation incorrectly specified that Larkin was required to submit the results of her February 8 blood-alcohol test by July 15 and that he was revising the date so that she could bring the test results with her to the planned meeting. (Pl.'s Supp'l Facts Ex. 37, E-mail from Robert Harney to Deborah Larkin (July 16, 2008, 7:58 a.m.).) In response, Larkin asserted that on July 8 she had been told that the test results were due by August 26 and that the District's February 11 letter had indicated only that she had to submit the results before she returned to work. (*Id.* Ex. 37, E-mail from Deborah Larkin to Robert Harney (July 16, 2008, 5:01 p.m.).) Larkin noted that she had not yet returned to work and that, in any event, she had "never been unwilling to provide the blood test." (*Id.*) She concluded:

> I want you to understand that I am extremely troubled by the miscommunication, the insubordination accusations for missing dates that were never communicated to me, and the various emails, letters and meetings that have been held to repeatedly discuss the same issues. I want you to know how hard I am working at maintaining my sobriety and how the district's reactions and miscommunications are making that recovery process more difficult.

(*Id.*)

Harney apologized for the "miscommunication" and agreed that the District would "abide by [the August 26] date." (*Id.* Ex. 37, E-mail from Robert Harney to Deborah Larkin (July 17, 2008, 1:02 p.m.).) He continued:

> In any event, this does not change the fact that you have been asked repeatedly to

provide the report since February and you have offered no reasonable basis for not doing so to date. . . .

We are now clear that you have until August 26th to produce a copy of the blood alcohol report to me. Of course, unless you can offer a reasonable excuse for not doing so, you are urged to provide a copy at our meeting prior to that date.

(*Id.*)

Harney later testified that he could not recall any requests for the test results by the District after February 11 and that he could not recall why he had written that Larkin had "been asked repeatedly" to provide the results. (Pl.'s Supp'l Facts ¶ 120; *id.* Ex. 13, at 51:14–53:21.)

Harney, Landis, and Kernop met with Larkin on July 24 to discuss how the District and the high school could help ensure that Larkin's return to her teaching position at the school "would be as successful as possible." (Pl.'s Supp'l Facts Ex. 33; *see also* Def.'s Facts ¶ 113.) As Harney reported in his July 25 letter to Larkin summarizing the meeting, he and Landis asked Larkin "if there were any obstacles or concerns that [the District] could address prior to [her] return in September." (Pl.'s Supp'l Facts Ex. 33.) They also offered to move Larkin's office at the high school so that she would not have to share it with another colleague, an accommodation that the District contends was suggested by Kernop and Larkin's attorney. (*Id.*; Def.'s Facts ¶ 114; Larkin Dep. at 192:20–193:11.) According to Harney, however, Larkin "declined to discuss anything pertaining to [her] return to the high school in the fall and offered no reaction to the offer [to move her] office." (Pl.'s Supp'l Facts Ex. 33; *see also* Def.'s Facts ¶ 115.) At the time, Kernop suggested to the District that Larkin's "lack of response was due to advice from [her] attorney." (Pl.'s Supp'l Facts Ex. 33.)

In his July 25 letter, Harney re-extended his invitation to Larkin "to share any concerns or ideas [she might] have that could help [the District] to help [her] make the return to [her]

position as successful as possible." (*Id.*)

Responding in a letter dated August 5, Larkin characterized Harney's letter as "inaccurate, incomplete and self-serving." She asserted that she had repeatedly told the District that she could not return to the high school because of the student population but that Harney "did not ask one single question concerning [her] request for a transfer[;] nor did [he] ask one single question concerning [her] health care providers' requests." She told Harney that she had filed a claim with the Pennsylvania Human Relations Commission, explaining that the District had not made "any real effort to engage in an open and productive exchange" to resolve the situation and had thus left her "no choice but to sue." (Pl.'s Supp'l Facts Ex. 34.)

In a letter to Harney dated August 4, Dr. Wiswe, Larkin's primary-care physician, asserted that Larkin could not return to her position at the high school:

> [Larkin] continues under my care and it is my medical opinion, as I have stated in the past, that she cannot return to her previous position at Methacton High School because it would jeopardize her health. She suffers from alcoholism and her return to previous work conditions place her at risk of relapse.

(Def.'s Mot. for Summ. J. Ex. R.)

Harney sent a letter to Dr. Wiswe asking for "additional information and clarification as to [her] comments." Among other things, he asked what aspects of Larkin's position at the high school and what sort of work conditions would jeopardize her health and put her at risk of a relapse, and whether there was anything that Larkin could do to avoid or minimize whatever risks were associated with returning to her position at the high school. (Def.'s Mot. for Summ. J. Ex. S.)

Harney also sent a letter to Larkin informing her that he had requested additional information from Dr. Wiswe and asserting that, in the meantime, Larkin was expected to return

to work at the high school:

> [Y]ou are currently assigned to teach at the High School and, given your Doctor's indication that you are fit to return to work and teach, you are expected to report to your assigned position next week. Again, I am extending to you an invitation to share with us any specific concerns or ideas you may have that could help us to help you make the return to your position at the High School as successful as possible.

(Pl.'s Supp'l Facts Ex. 35.)

Citing confidentiality concerns, Dr. Wiswe declined to answer Harney's questions or to provide any further information regarding Larkin. In a letter dated September 8, 2008, she asserted that she is "a licensed physician and therefore [is] at times charged with judging if a patient is able to perform specific job duties under specific work conditions" and that her "judgement is that [Larkin] is not able to return to her previous job position at her previous job location." (Def.'s Mot. for Summ. J. Ex. T.)

### F.    Larkin's Application for FMLA Leave

In late August or early September 2008, Larkin sent several questions to the District regarding her eligibility for leave under the Family and Medical Leave Act ("FMLA"), and Harney responded in an e-mail to Larkin on September 2. (Pl.'s Supp'l Facts Exs. 38, 39.) The District initially concluded that Larkin would not be entitled to FMLA leave, because she had not satisfied the FMLA eligibility requirements—according to the District's records, Larkin had worked only 888 hours (compared with the requisite 1,250 hours) in the preceding twelve months. (*Id.* Ex. 38.)

After receiving an e-mail from Kernop stating that the teachers' union disagreed with the District's interpretation of the FMLA and the conclusion that the District had reached regarding

Larkin's eligibility for FMLA leave, Harney sent a follow-up letter to Larkin in which he

acknowledged his mistake and clarified the District's position regarding Larkin's eligibility. (*Id.*

Ex. 39.)

The District ultimately granted Larkin's request for FMLA leave, even though it "never

fully documented [Larkin's] extra time needed to fulfill the hours needed to be eligible." (*Id.*

Ex. 41; Pl.'s Resp. to Def.'s Facts ¶ 137.)

### G. The Current Lawsuit

Larkin filed this action against the District on September 11, 2009, alleging claims of

discrimination and retaliation in violation of the ADA and the PHRA.[5] In particular, Larkin

alleges in her complaint that the District denied the transfers to an elementary-school position

(i.e., failed to hire her for either of the two elementary-school positions for which she was

qualified) because of her disability and that the District failed to reasonably accommodate her by

---

[5] Both Title VII, whose enforcement provisions govern ADA claims, and the PHRA establish administrative remedies and procedures that a plaintiff must exhaust before brining a civil action in court. *See* 42 U.S.C. § 2000e-5; 43 Pa. Stat. Ann. §§ 959(a), (h), 962(c); *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 469 (3d Cir.2001). Larkin states in her complaint that she "has exhausted all her administrative remedies and has satisfied all procedural requirements to proceed with this action" and that she initiated this action "within ninety (90) days of [her] receipt of a right to sue letter from the Pennsylvania Human Relation[s] Commission." (Compl. ¶¶ 5–6.) There is nothing in the record to substantiate her assertions, however, and the District, in its answer, denies these averments. (Def.'s Answer ¶¶ 5–6.) Nonetheless, because the District does not now contend in its motion for summary judgment that Larkin has failed to exhaust administrative remedies or that her claims are time-barred, I need not address whether Larkin has satisfied the exhaustion requirements or whether Larkin's claims are timely. *See Wilson v. MVM, Inc.*, 475 F.3d 166, 173–75 (3d Cir. 2007) (explaining that Title VII's administrative-exhaustion requirements are prudential, not jurisdictional, and therefore subject to waiver, estoppel, and equitable tolling); 43 Pa. Stat. Ann. § 962(e) ("The time limits for filing . . . any complaint or other pleading under this act [the PHRA] shall be subject to waiver, estoppel and equitable tolling.").

refusing to transfer her to an elementary-school position. (Compl. ¶¶ 73–74.) Larkin also alleges

that the District denied the transfers and engaged in other adverse employment actions in

retaliation for her request for a reasonable accommodation and her complaints regarding the

District's handling of her request. (*Id.* ¶¶ 75–77.)

After discovery, the District filed this motion for summary judgment.

## II.    STANDARD OF REVIEW

A motion for summary judgment will be granted only "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).[6] "Facts that could alter the outcome are 'material,' and disputes are

'genuine' if evidence exists from which a rational person could conclude that the position of the

person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John*

*Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996). "Where the record taken as a whole could not lead

a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l*

*Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

The moving party bears the initial burden of showing that there is no genuine issue of

material fact and that it is entitled to relief. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). Once the moving party has met its initial burden, the nonmoving party must present

_____

[6] Amendments to the Federal Rules of Civil Procedure, including Rule 56, took effect on December 1, 2010. Because the amendments "govern in all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending," Order of the United States Supreme Court Amending the Federal Rules of Civil Procedure (Apr. 28, 2010), and because the substantive standard for granting summary judgment remains unchanged, I refer to the amended rule.

"specific facts showing that there is a *genuine issue for trial*," *Matsushita*, 475 U.S. at 587

(quoting Fed. R. Civ. P. 56(e)), offering concrete evidence supporting each essential element of

its claim, *see Celotex*, 477 U.S. at 322–23. The nonmoving party must show more than "[t]he

mere existence of a scintilla of evidence" for elements on which it bears the burden of

production, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and may not "rely merely

upon bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. v. DuFresne*, 676

F.2d 965, 969 (3d Cir. 1982).

When a court evaluates a motion for summary judgment, "[t]he evidence of the

nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."

*Anderson*, 477 U.S. at 255. "Summary judgment may not be granted . . . if there is a

disagreement over what inferences can be reasonably drawn from the facts even if the facts are

undisputed." *Ideal Dairy Farms*, 90 F.3d at 744 (internal quotation marks and citations omitted).

"[A]n inference based upon a speculation or conjecture," however, "does not create a material

factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*,

914 F.2d 360, 382 n.12 (3d Cir. 1990).

## III.  DISCUSSION

Larkin claims that the District discriminated against her in violation of the ADA and the

PHRA[7] by (a) failing to hire her for elementary-school positions for which she was qualified and

(b) failing to provide a reasonable accommodation for her disability—namely, a transfer to an

---

[7] Because courts "generally interpret the PHRA in accord with its federal counterparts," and the Third Circuit has thus recognized that it is proper to treat ADA and PHRA claims collectively, I will reference only the ADA in this discussion. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996); *see also Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 n.3 (3d Cir. 2010).

elementary-school position. Larkin further claims that the District unlawfully retaliated against her for requesting a reasonable accommodation and filing a grievance regarding the District's handling of her request.

## A.     Larkin's Discrimination Claims

The ADA "prohibits certain employers from discriminating against individuals on the basis of their disabilities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 475 (1999). The statute provides: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[8] Discrimination under the ADA encompasses not only such disparate treatment but also the failure to provide a reasonable accommodation for an individual's disability. The ADA provides that an employer engages in discrimination when it does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . , unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the

---

[8] Amendments to the ADA took effect on January 1, 2009. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). Because the events giving rise to Larkin's claims occurred before these amendments became effective, and because the parties do not contend that these amendments have retroactive effect, I refer to the law as it existed at the time the events took place. *See Britting v. Sec'y, Dep't of Veterans Affairs*, No. 10-2554, 2011 WL 300240, at *2 (3d Cir. Feb. 1, 2011) (not precedential) (holding that the amendments "cannot be applied retroactively"); *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 n.2 (3d Cir. 2010) (applying "the statute and regulations as they existed during the events in question," where the "parties . . . have not argued that these amendments have retroactive effect"); *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 501 n.5 (3d Cir. 2010) (declining to reach the issue of retroactivity, but noting that "every court of appeals decision of which we are aware has held that the amendments are not retroactive").

operation of the [employer's] business." 42 U.S.C. § 12112(b)(5)(A).

Larkin brings two separate discrimination claims. First, she claims that the District discriminated against her by denying her transfers (i.e., by failing to hire her for elementary-school positions for which she was qualified). She contends that the District hired less qualified candidates for the positions she sought.[9] Second, Larkin claims that the District discriminated against her by failing to provide a reasonable accommodation for her disability—namely, a transfer to an elementary-school position.

To state a cognizable claim of discrimination under the ADA, "a putative plaintiff must establish that [she] is a 'qualified individual with a disability.'" *Marinelli v. City of Erie*, 216 F.3d 354, 359 (3d Cir. 2000). The District argues that Larkin is not disabled within the meaning of the ADA and thus cannot sustain a discrimination claim. Because I agree that Larkin has failed to present sufficient evidence from which a jury could reasonably conclude that she is disabled within the meaning of the ADA, I will grant the District's motion for summary judgment as to both of Larkin's discrimination claims.

A plaintiff such as Larkin can establish that she has a disability by demonstrating that she has "a physical or mental impairment that substantially limits [a] major life activit[y]," 42 U.S.C. § 12102(2)(A), has "a record of such an impairment," *id.* § 12102(2)(B) ("record of disability"), or is "regarded as having such an impairment," *id.* § 12102(2)(C) ("regarded as disabled"). Larkin argues that she is disabled under each of the three definitions.

---

[9] In her complaint, Larkin alleges that the candidate selected for the split position was hired in violation of the collective bargaining agreement. (Compl. ¶ 37.) She does not address this allegation in her brief opposing the District's motion for summary judgment, however, and thus appears to have abandoned this argument.

### 1.   Does Larkin Have an Impairment That Substantially Limits a Major Life Activity?

Larkin contends that she has presented sufficient evidence from which a jury could reasonably conclude that her alcoholism substantially limits a major life activity and thus constitutes a disability under the ADA.

The parties do not dispute that alcoholism constitutes an impairment under the ADA; the issue is whether Larkin's alcoholism substantially limits a major life activity—or, more precisely, whether her alcoholism substantially limited a major life activity when she requested a reasonable accommodation and when she applied for the elementary-school positions, *see Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 308 (3d Cir. 1999). The Supreme Court has stressed that "whether a person has a disability under the ADA is an individualized inquiry," *Sutton*, 527 U.S. at 483, and that courts must "determine the existence of disabilities on a case-by-case basis," *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999). In engaging in that individualized inquiry, a court must first identify the specific life activities that the plaintiff claims are affected and determine whether those activities are "major life activities" under the ADA, and then must evaluate whether the plaintiff's impairment substantially limits those major life activities. *See Taylor*, 184 F.3d at 306–07.[10]

---

[10] Although some courts have found that alcoholism is a disability without examining whether a plaintiff's alcoholism substantially limited any major life activities, *see, e.g.*, *Office of the Sergeant at Arms v. Office of Senate Fair Emp't Practices*, 95 F.3d 1102, 1105 (Fed. Cir. 1996) ("It is well-established that alcoholism meets the definition of a disability."), most courts have engaged in the individualized inquiry described in *Sutton*, *see, e.g.*, *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 670 (7th Cir. 2011); *Bailey v. Georgia-Pacific Corp.*, 306 F.3d 1162, 1167–68 (1st Cir. 2002); *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 47 (2d Cir. 2002); *Burch v. Coca-Cola Co.*, 119 F.3d 305, 316 (5th Cir. 1997). The Third Circuit has not squarely addressed the issue. In a 1987 Rehabilitation Act case in which the lower court had preliminarily enjoined the closing of alcoholic treatment facilities, the Third

The EEOC regulations accompanying the ADA define "substantially limits" to mean either "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major activity." 29 C.F.R. § 1630.2(j)(1).[11]

The Supreme Court has cautioned that in determining whether an impairment substantially limits a major life activity, courts must not "settle for a mere difference" in an individual's performance of a major life activity. *Albertson's*, 527 U.S. at 565. According to the Court, "[t]he word 'substantial' . . . clearly precludes impairments that interfere in only a minor way with the performance of [a major life activity] from qualifying as disabilities." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002). The Third Circuit has thus "held only extremely limiting disabilities—in either the short or long-term—to qualify for protected status under the ADA." *Marinelli v. City of Erie, Pa.*, 216 F.3d 354, 362 (3d Cir. 2000).

---

Circuit, citing two district court opinions, concluded that the lower court had not erred in finding that the plaintiffs were likely to succeed on the merits, because "[c]ase law establishes that alcoholics are handicapped within the meaning of § 504." *Sullivan v. City of Pittsburgh*, 811 F.2d 171, 182 (3d Cir. 1987). In a more recent ADA case, the Third Circuit treated alcoholism as a disability without any discussion. *See Smith v. Davis*, 248 F.3d 249 (3d Cir. 2001) (examining only whether plaintiff was "qualified" within the meaning of the ADA and whether defendant's proffered reason for termination was pretextual).

[11] As the Third Circuit has explained, "[t]he Supreme Court left unresolved in *Sutton* what deference, if any, [the EEOC] regulations are due. . . . The Court concluded that it did not have to resolve the issue of deference because the parties . . . did not contest the validity of the regulations . . . that interpret the generally applicable provisions." *Taylor*, 184 F.3d at 307. Because the Third Circuit has previously applied the EEOC regulations, *see, e.g.*, *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 762 (3d Cir. 2004); *Taylor*, 184 F.3d at 307, and neither party has challenged the regulations, I see no reason not to apply them here.

Larkin concedes that "[n]ot everyone diagnosed with alcoholism is substantially limited in a major life activity." (Mem. of Law in Opp'n to Def.'s Summ. J. Mot. ("Pl.'s Br.") at 7.) But she contends that her alcoholism substantially limits her ability to care for herself and to think. She asserts that, because of her alcoholism, working at the high school and "facing the barrage of substance abuse and other emotional issues posed by her high school students on a daily basis"—which she says are "triggers for her to drink"—substantially limits her "ability to care for herself and to think clearly to avoid succumbing to the next drink." (Pl.'s Br. at 7–8.) But she does not submit any facts to support this conclusion.

Although the ADA does not define the term "major life activity," caring for oneself is a major life activity under the regulations accompanying the ADA. *See* 29 C.F.R. § 1630.2(i) (defining the term "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working"). Courts have generally held that the activity of caring for oneself encompasses the "normal activities of daily living," including "feeding oneself, driving, grooming, and cleaning home." *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 47 (2d Cir. 2002) (holding that "the inability to live independently without suffering a relapse" substantially limited the major life activity of caring for oneself and thus that residents of a halfway house for recovering alcoholics were disabled under the ADA); *cf. Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 784 (7th Cir. 2007) (concluding, as a matter of law, that the limitations claimed by plaintiff did not demonstrate that she was prevented or severely restricted from caring for herself where she could still perform tasks of "driving, bathing, brushing her teeth, [and] dressing herself").

Here, Larkin has offered no evidence that her alcoholism substantially limited her ability

to perform any of these "normal activities of daily living," and indeed, she testified at her deposition that when she requested a transfer as a reasonable accommodation, she had no problems caring for herself. (Larkin Dep. at 52:9–19).[12]

Similarly, although the Third Circuit has recognized thinking as a major life activity, *see Taylor*, 184 F.3d at 307 (concluding that "it is reasonable to include thinking as a major life activity"), Larkin has not provided sufficient evidence that her alcoholism substantially limited her ability to think. Larkin explains generally that "alcoholism affects and progressively impairs virtually every aspect of functioning including: impulse control; judgment; reasoning; emotional regulation; and relational interactions" (Pl.'s Br. at 4), but she offers no specific evidence demonstrating either how her alcoholism affected *her* ability to think or the severity of *her* limitations. *Cf. Taylor*, 184 F.3d at 304, 308–09 (despite benefits of medication, plaintiff with bipolar disorder still suffered symptoms of her disorder, including paranoia, and "impaired concentration and memory problems" resulted in "missed deadlines, mishandling of records, typing errors, interpersonal conflicts, and undelivered messages" at work); *Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 569–70 (3d Cir. 2002) (plaintiff produced evidence that her supervisor had provided her with video and audio tapes to help her in overcoming her

_____

[12] As Larkin testified:
Q: At the time you applied for [the elementary-school] positions, did you have any problems caring for yourself?
A: Any problems?
Q: Any problems caring for yourself.
A: I had to focus on my recovery at that time; no.
Q: At the time you applied for those positions, did you have any problems performing manual tasks?
A: No.
(Larkin Dep. at 52:9–19.)

memory problems and plaintiff's husband and son testified as to her difficulty concentrating and focusing); *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 617 (5th Cir. 2009) (plaintiff testified that "she suffered from episodes of aphasia, including times when she forgot her own son's name, an inability to concentrate, forgetfulness about how to perform routine tasks, and falling asleep or losing focus while driving."). To the contrary, at her deposition Larkin testified that when she applied for the elementary-school positions, she had no problems learning (Larkin Dep. at 53:13–16), and that she "could teach students," "could teach health," and "could teach phys-ed" (*id.* at 55:24–56:1), which suggests that her ability to think was not substantially limited.

Larkin's reliance on the "uncontroverted certifications" of her health-care providers (Pl.'s Br. at 8) to establish that she was substantially limited in her ability to care for herself and to think is unavailing. Although "a plaintiff in an ADA case can rely on the testimony of his or her treating physician to demonstrate that the plaintiff has a disability," *Taylor*, 184 F.3d at 308 n.3, Larkin's doctor has provided nothing more than the conclusory statement that "based on my treatment of Ms. Larkin and my experience, I determined that Ms. Larkin was substantially limited in her abilities to take care of herself, think, remain sober and continue her recovery." (Pl.'s Supp'l Facts Ex. 10, ¶ 12.) As the Third Circuit and other courts have recognized, the term "disabled" is "a legal term of art," *Taylor*, 184 F.3d at 311, and Dr. Wiswe has provided no evidence or facts from which a jury could reach the conclusion that Larkin was disabled within the meaning of the ADA. Indeed, in response to Harney's August 22, 2008, letter requesting additional information regarding Larkin's condition and limitations, Dr. Wiswe declined to provide any further information, asserting that she is "at times charged with judging if a patient

is able to perform specific job duties under specific work conditions" and that her "judgement is that [Larkin] is not able to return to her previous job position at her previous job location." (Def.'s Mot. for Summ. J. Ex. T.)

Moreover, Dr. Wiswe's statement is undermined by her own treatment notes, in which she observed that Larkin's "[t]hought processes were not impaired" and that her "[t]hought content revealed no impairment." (Treatment Notes of Dr. Wiswe May 8, 2008).[13] Similarly, around the time that Larkin applied for the split position, one of Larkin's therapists asserted that "Larkin remains very competent in every way to continue teaching" and did not suggest that Larkin's ability to think was impaired in any way.(Def.'s Mot. for Summ. J. Ex. N, Letter from Mary McCormick to Larry Feeley (May 7, 2008).) And there is nothing in Dr. Wiswe's treatment notes—or in the letters that Larkin's therapists and health-care providers sent to the District—that suggests that Larkin was unable to care for herself.

Although I am not unsympathetic to Larkin, her conclusory assertions that her alcoholism substantially limits her ability to care for herself and to think simply are not sufficient to create an issue of fact as to whether she is disabled. *See, e.g.*, *Heisler v. Metro. Council*, 339 F.3d 622, 628 (8th Cir. 2003) ("[B]ald assertions that one is limited in a major life activity are insufficient to withstand summary judgment."). There must be at least some factual evidence in the record to support such a conclusion.

---

[13] During discovery, the District subpoenaed Larkin's medical records, a copy of which was provided to me. Neither party, however, cited those medical records in their briefs or included those records in the exhibits accompanying their briefs. Dr. Wiswe made the same observations as to Larkin's thought process and thought content when she examined Larkin on March 12, 2008, April 9, 2008, May 8, 2008, July 17, 2008, September 8, 2008, October 8, 2008, November 10, 2008, and December 15, 2008.

## 2.    Does Larkin Have a Record of Disability?

Larkin next argues that even if she does not have an actual disability within the meaning of the ADA, she has a record of a physical or mental impairment that limits one or more major life activities, *see* 42 U.S.C. § 12102(2)(B), and thus is entitled to the protection of the ADA's antidiscrimination provision.

The purpose of the "record of disability" provision "is largely to protect those who have recovered or are recovering from substantially limiting impairments from discrimination based on their medical history." *Bailey v. Georgia-Pacific Corp.*, 306 F.3d 1162, 1169 (1st Cir. 2002). Accordingly, to demonstrate a record of disability, a plaintiff such as Larkin must show that she "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). "This inquiry is fact-intensive and focuses on whether the plaintiff has submitted evidence that the actual extent of his or her impairment was substantial." *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 437 (3d Cir. 2009).

Here, even if Larkin can demonstrate a record of impairment (alcoholism), she has failed to present evidence of a record that her alcoholism substantially limited a major life activity, and her contention thus must fail. *See Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 513 (3d Cir. 2001).

In support of her claim, Larkin appears to rely on the fact that she checked herself into Caron for thirty days for treatment for her alcoholism and that she remained out of work for a period of time after her discharge from Caron. But these facts alone are not sufficient to establish a record of a substantially limiting impairment. *See Colwell v. Suffolk Cnty. Police Dep't*, 158

F.3d 635, 645–46 (2d Cir. 1998) (finding that hospitalization for thirty days after cerebral hemorrhage followed by recuperation at home for six months, without specific evidence that the "impairment for which [plaintiff] was hospitalized was imposing a substantial limitation of one or more of his major life activities," was not sufficient to demonstrate a record of disability); *see also Burch v. Coca-Cola Co.*, 119 F.3d 305, 316 (5th Cir. 1997) (asserting that the fact that plaintiff had to be hospitalized for treatment for his alcoholism was not sufficient to demonstrate that his alcoholism substantially limited any major life activities).

Nor is it relevant for purposes of this inquiry, contrary to Larkin's suggestion, that she may have been classified as disabled under the collective bargaining agreement while she was out on leave. *See* 29 C.F.R. pt. 1630 App., § 1630.2(k) (explaining that because "[o]ther statutes, regulations and programs may have a definition of 'disability' that is not the same as the definition set forth in the ADA," "[t]he fact that an individual . . . is classified as disabled for other purposes" is not sufficient to establish a record of disability). Because the definition of "disability" under the collective bargaining agreement differs from that under the ADA—under the agreement, an individual is disabled and entitled to disability leave "whenever [he or she] is unable to perform his [or] her duties" (Def.'s Mot. for Summ. J. Ex. E, at 21)—her classification as disabled for purposes of determining leave eligibility does not support an inference that she has a record of disability.

### 3. Was Larkin Regarded as Disabled?

Finally, Larkin argues that she is disabled under the ADA because the District regarded her as disabled. *See* 42 U.S.C. § 12102(2)(C).

To establish disability on this basis, a plaintiff must show that the employer either

"mistakenly believe[d] that [the plaintiff] has a physical impairment that substantially limits one or more major life activities" or "mistakenly believe[d] that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton*, 527 U.S. at 489; *see also Sulima v. Tobyhanna Army Depot*, 602 F.3d 177 (3d Cir. 2010) (applying this standard).

In support of her claim, Larkin asserts that the District knew that she was an alcoholic; that the District "granted her FMLA leave based on the stated reason that she was getting treatment for her alcoholism"; that Harney and Feeley "both testified that they considered [her] disabled under the [collective bargaining agreement]"; and that Stevenson "testified that her former husband was an alcoholic, so she understood the disease, understood the 'people, places and things' concept and empathized with [Larkin]." (Pl.'s Br. at 11.) None of this evidence, however, demonstrates an issue of fact as to whether the District regarded Larkin as disabled within the meaning of the ADA.

Neither the District's approval of Larkin's request for FMLA leave nor Harney's and Feeley's testimony that they considered her disabled under the collective bargaining agreement supports an inference that the District regarded Larkin as disabled. "As courts have recognized in various contexts, there may be some parallels between the ADA and [the] FMLA, but applicable regulations explicitly state that [the] ADA's 'disability' and the FMLA's 'serious health condition' are different concepts, and must be analyzed separately." *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1219–20 (10th Cir. 2007) (internal quotation marks and citations omitted) (concluding that employer's approval of plaintiff's application for FMLA leave "does not demonstrate an issue of fact as to whether [plaintiff] was considered disabled under the ADA"); *accord Robinson v. Lockheed Martin Corp.*, 212 F. App'x 121, 125 (3d Cir. 2007) (not

precedential); *see also* 29 C.F.R. § 825.702(a), (b). Similarly, as discussed in the previous subsection, because the definition of "disability" under the collective bargaining agreement differs from that under the ADA, Larkin's entitlement to disability leave under the collective bargaining agreement does not support an inference that the District regarded her as disabled within the meaning of the ADA.

Nor is there any significance, for purposes of determining whether the District regarded Larkin as disabled, to Stevenson's testimony that she understood the disease of alcoholism and could empathize with Larkin. "It is insufficient for [a plaintiff] to show that [the employer] thought [she was] in some way, impaired. Rather, [a plaintiff] must show that [the employer] thought [she was] disabled within the meaning of the statute." *Wilson v. MVM, Inc.*, 475 F.3d 166, 179 (3d Cir. 2007) (internal quotation marks and citation omitted). Even if Stevenson viewed Larkin as suffering from a disease or impairment, Larkin has presented no evidence to suggest that Stevenson regarded Larkin as disabled within the meaning of the ADA—that is, that Stevenson believed that Larkin's alcoholism substantially limited one or more of her major life activities.

And Larkin has offered no other evidence from which a jury could reasonably conclude that the District regarded her as disabled. It is undisputed that the District officials from whom Larkin sought a reasonable accommodation, as well as the elementary-school principals who interviewed Larkin and made the decisions not to hire her for either the Audubon position or the split position, were aware that Larkin was a recovering alcoholic.[14] But "[t]he mere fact that an

---

[14] Because Larkin brings two separate discrimination claims—the first for failing to hire her for an elementary-school position because of her disability, and the second for failing to provide a reasonable accommodation for her disability—in determining whether the District

employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996). And Larkin has presented no evidence to suggest that any of these individuals viewed her alcoholism as disabling.

Indeed, the record actually suggests that District officials did not regard Larkin as disabled. Both Feeley and Harney made it clear that they expected her to return to her position at the high school. And in his June 26 letter to Larkin, Feeley asserted that, in the District's view, Larkin was "not disabled, as that term is defined by [the ADA]," because there was nothing to suggest "any functional limitations as to any major life activities imposed upon [her] by [her] condition." (Def.'s Mot. for Summ. J. Ex. P, at 1.)

\* \* \*

Larkin has failed to present sufficient evidence from which a jury could reasonably conclude that she is disabled under either of the three definitions of "disability" set forth in the ADA. As a result, she was not entitled to any accommodation under the ADA. Nor can she claim that she was otherwise discriminated against under the ADA. Accordingly, I will grant the District's motion for summary judgment as to both of Larkin's discrimination claims.

---

regarded her as disabled, it is important to distinguish between those responsible for the hiring decision and those from whom she sought a reasonable accommodation.

## B. Larkin's Retaliation Claim

The ADA prohibits an employer from retaliating against an employee for engaging in certain protected conduct. *See* 42 U.S.C. § 12203(a). The statute provides:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA].

*Id.*

Larkin claims that the District unlawfully retaliated against her for requesting a transfer to an elementary-school position as a reasonable accommodation and for filing a grievance regarding the District's handling of her request.

Although requesting a reasonable accommodation does not appear to "fit[] within the literal language of the statute," *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997), the Third Circuit has held that a good-faith request for an accommodation is protected activity under the ADA's antiretaliation provision, *see Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003); *accord Soileau*, 105 F.3d at 16 ("It would seem anomalous . . . to think Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge.").

And "[u]nlike a plaintiff in an ADA *discrimination case*, a plaintiff in an ADA *retaliation* case need not establish that [she] is a 'qualified individual with a disability.'" *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997). "Thus, as opposed to showing disability, a plaintiff need only show that she had a reasonable, good faith belief that she was entitled to request the reasonable accommodation she requested," *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759 n.2 (3d Cir. 2004), and a plaintiff such as Larkin may pursue a

retaliation claim even though she has failed to establish that she is disabled within the meaning of the ADA, *see Shellenberger*, 318 F.3d at 188.

Courts analyze ADA retaliation claims under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Williams*, 380 F.3d at 759 n.3. Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of retaliation. *See Krouse*, 126 F.3d at 500. To establish a prima facie case, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Id.* at 500.

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nonretaliatory reason for the adverse action. *See id.* "The defendant's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse action]; the defendant need not prove that the articulated reason actually motivated the [action]." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997).

Finally, if the defendant articulates such a reason, "the plaintiff must be able to convince the factfinder both that the [defendant's] proffered explanation was false, and that retaliation was the real reason for the adverse . . . action." *Krouse*, 126 F.3d at 501. Although the burden of production shifts, "[t]he ultimate burden of persuading the trier of fact that the defendant [retaliated] against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The District contends that it is entitled to summary judgment on Larkin's retaliation claim because Larkin cannot establish a prima facie case of retaliation and, in any event, the

District has offered legitimate, nonretaliatory reasons for its actions and Larkin has submitted no evidence demonstrating that there is a genuine issue of material fact about whether these reasons are merely a pretext for retaliation.

Larkin alleges eight adverse actions taken by the District after she requested that she be transferred to an elementary-school teaching position: (1) failing to engage in the interactive process required by the ADA; (2) failing to transfer her to one of the two open elementary-school positions for which she was qualified; (3) forcing her "to endure a sham interview process"; (4) giving her an unsatisfactory rating; (5) harassing her and accusing her of failing to provide the results of her blood-alcohol test; (6) initially refusing to grant her FMLA leave; (7) insisting that she return to her teaching position at the high school "despite medical advice to the contrary"; and (8) accusing her of not engaging in the interactive process. (Pl.'s Br. at 14.)

The Third Circuit has "indicated that a [retaliation] analysis must concentrate not on individual incidents, but on the overall scenario." *Shaner v. Synthes (USA)*, 204 F.3d 494, 503 n.9 (3d Cir. 2000) (internal quotation marks and citation omitted). The court has also recognized, however, that "where, as here, a plaintiff alleges that . . . retaliation is evidenced by discrete categories of conduct, . . . some examination of each category is necessary in order to assess the merits of the case." *Id.* Following the Third Circuit's example, I will examine each of the categories of improper conduct alleged by Larkin, "keeping in mind [the Third Circuit's] admonition that '[a] play cannot be understood on the basis of some of its scenes but only on its entire performance.'" *Id.*

### 1. Failure to Engage in Interactive Process

Larkin claims that the District retaliated against her by failing to engage in the interactive process.[15] This claim, however, lacks merit. Because, as previously discussed, Larkin is not disabled within the meaning of the ADA, the District was under no obligation to provide a reasonable accommodation for her. It would be incongruous to now hold that the District nonetheless unlawfully retaliated against Larkin by failing to engage in the interactive process to seek a reasonable accommodation. The antiretaliation provision is intended to ensure "'unfettered access to statutory remedial mechanisms'" by "prevent[ing] harm to individuals" who engage in protected activity. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63–64 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)). It should not be interpreted as imposing upon an employer an affirmative duty to accommodate that it would not otherwise have.

### 2. Failure to Transfer to Elementary-School Position and "Sham" Interview Process

Larkin claims that the District retaliated against her by failing to transfer her to one of the two open elementary-school positions for which she was qualified. The District contends that this failure to accommodate, like the failure to engage in the interactive process, is not a proper basis for a retaliation claim, because an employer's duty to provide a reasonable accommodation arises only if an employee is disabled and Larkin was not disabled. Although I agree that the District cannot be held liable under the ADA's antiretaliation provision for failing to

---

[15] The "interactive process" refers to the process by which an employee who has requested an accommodation for a disability and his or her employer "identify the precise limitations resulting from the [employee's] disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3).

accommodate Larkin, I construe Larkin's claim, together with her contention that the District forced her "to endure a sham interview process" (Pl.'s Br. at 14),[16] as alleging a failure to hire her for positions for which she was qualified, which is an actionable adverse action under the ADA's antiretaliation provision. *See Burlington N.*, 548 U.S. at 60.

Nonetheless, Larkin's claim fails because, assuming for the sake of argument that Larkin has established a prima facie case of retaliation, the District has articulated legitimate, nonretaliatory explanations for its decisions and Larkin has not proffered evidence to permit a jury to reasonably conclude that the District acted with retaliatory intent.

"[T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, [nonretaliatory] reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious [retaliatory] reason was more likely than not a . . . determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).[17] Larkin has failed to raise a material issue of fact on either

---

[16] To the extent that Larkin suggests in her brief that the interview process for both the Audubon position and the split position was a sham, her argument is contradicted by her deposition testimony. At her deposition, she testified that the use of the phrase "sham interview" in her complaint did not apply to the interview conducted by Gorla for the Audubon position and that although she "struggled" with the outcome of that interview, she did not "have any problem" with the way that the interview was conducted or with the interview process. (Larkin Dep. at 140:15–141:1; *see also* Pl.'s Resp. to Def.'s Facts ¶ 76 ("Admitted that Ms. Larkin had no problem with the way that the [Audubon] interview was conducted.").)

[17] In *Fuentes*, the Third Circuit asserted that a plaintiff could defeat summary judgment by pointing to evidence "from which a factfinder could reasonably . . . believe that an invidious discriminatory reason was more likely than not a *motivating* factor or determinative cause of the employer's action." 32 F.3d at 764 (emphasis added). But *Fuentes* was a *discrimination* case, and in *Woodson*, the Third Circuit held that the "motivating factor" standard does not apply to *retaliation* cases. *See* 109 F.3d at 931–35.

ground.

"To discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether [retaliatory] animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765. Rather, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence and hence infer that the employer did not act for the asserted [nonretaliatory] reasons." *Id.* (internal quotation marks, brackets, and citations omitted).

With respect to the Audubon position, the District contends that Gorla hired Godri instead of Larkin because Gorla thought that Godri was the better candidate—not only did Godri have elementary-school experience within the District, but, according to Gorla, "she was very energetic and gave a positive outlook of working with young children." (Gorla Dep. at 16:20–17:17; Def.'s Facts ¶ 74.)

Larkin makes three arguments in an attempt to discredit the District's explanation and suggest that retaliation was the more likely cause of the decision not to hire her.

First, Larkin asserts that Gorla did not know that Larkin had elementary-school experience. Larkin, however, does not allege—nor is there anything in the record that would suggest—any improper reason as to why Gorla did not know about her elementary-school experience. And in the absence of any evidence of a lack of good faith on the part of Gorla or the District that would have prevented Gorla from learning of Larkin's elementary-school experience, Larkin's assertion simply does not cast doubt on the District's proffered explanation

that Gorla selected Godri in part because of her elementary-school experience in the District.

Second, Larkin asserts that Gorla rated Godri higher on the interview rating form even though Larkin "had more education and experience than [Godri]." (Pl.'s Br. at 19.) Larkin, however, has not offered any evidence as to Godri's experience, and Larkin's unsupported assertion that she had more education and experience than Godri is not sufficient to survive summary judgment. *See Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) ("Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment."). Moreover, the fact that Larkin may have had more education and experience than Godri, even if true, does not demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions," *Fuentes*, 32 F.3d at 765, in the District's proffered reason for its hiring decision. Indeed, it is fully consistent with Gorla's explanation that she based her hiring decision, at least in part, on Godri's elementary-school experience in the District. If elementary-school experience in particular was important to Gorla, she may very well have rated the candidates' experience according to the type of experience, not merely the amount of experience.

Finally, Larkin attempts to cast doubt on the District's explanation by asserting that Gorla "rated [her] appearance as a 6 out of 10 [on the interview rating form], even though [she] wore a clean and pressed blue business suit." (Pl.'s Br. at 19.)[18] This assertion too fails to "cast substantial doubt," *Fuentes*, 32 F.3d at 765, on the District's proffered reason for not hiring Larkin.

---

[18] Godri was rated a 7 (Def.'s Mot. for Summ. J. Ex. L), but there is nothing in the record as to how she was dressed or her appearance more generally.

With respect to the split position, the District contends that MacGregor and Petino decided not to select Larkin because she lacked the elementary-school experience they were looking for and because she did not demonstrate enthusiasm or energy during the interview. The District asserts that at his deposition, MacGregor testified that Larkin's responses during the interview were "average" and that he "wasn't satisfied that she was . . . the best candidate we could get for the job," because she had high-school experience but not elementary-school experience. (MacGregor Dep. at 22:6–7, 22:24–23:5.) And Petino testified that Larkin did not exhibit the "[h]igh energy, enthusiasm, love for the job," or "experience working in an elementary school" that he was looking for. (Petino Dep. at 29:17–20, 33:14–19.)

Larkin again makes several arguments in an attempt to either discredit the District's explanation or suggest that retaliation was the more likely cause of the decision not to hire her.

First, Larkin asserts that Feeley and Jeffrey Jacobs, the health and physical-education coordinator for the Methacton elementary schools, interviewed the other five candidates for the split position (in Feeley's case, all but one of the other candidates) but did not interview her. Larkin seems to be arguing that if the District had given serious consideration to her application for the split position, Feeley and Jacobs would have interviewed her as well.

Feeley testified at his deposition that he did not interview Larkin for the split position because she was already working in the District and, according to practice, in the case of transfer requests within the District, the human-resources director was not involved in either the interview process or the hiring decision. (Pl.'s Supp'l Facts Ex. 3, at 96:4–20, 112:13–113:12.) Larkin, however, offers evidence that casts doubt on Feeley's explanation for his decision not to interview her. Feeley's assistant, for example, was apparently unaware of this practice because

she initially told Larkin that Feeley would participate in the interview for the split position. (Pl.'s Supp'l Facts ¶ 96.) And neither Timothy Quinn, who succeeded Barbara Stevenson as the District superintendent, or Diana Kernop, the president of the local teachers' union, was aware of such a practice. (*Id.* ¶¶ 98–99.) Even if Feeley's decision not to interview Larkin was motivated by retaliatory animus, however, there is no evidence in the record that his failure to interview her had any bearing on MacGregor and Petino's decision not to hire her or that Feeley otherwise played any role in the decision not to hire Larkin, beyond informing her of MacGregor and Petino's decision.[19]

Similarly, Jacobs testified that he had to ask MacGregor for permission to participate in the interviews for the split position. (Pl.'s Supp'l Facts Ex. 31, at 19:11–21:5.) Jacobs was unaware that Larkin was being interviewed for the position and did not ask for permission to participate in the interviews until sometime after she had been interviewed. (*Id.* at 22:13–25:3.) Jacobs received permission to participate in the subsequent interviews, but he was told that although he could voice his opinion as to the candidates, he probably would not be involved in the final decision. (*Id.* at 19:11–20:5.) Given his limited role in the interview process, the fact that Jacobs did not participate in Larkin's interview does not undermine the District's proffered explanation.

Larkin also complains that her interview with MacGregor and Petino was interrupted twice, arguing, once again, that the District was not seriously considering her for the position and that the interview process was a "sham." (Pl.'s Br. at 19.)[20] The interview, which lasted

---

[19] I note as well that there is no evidence in the record that Feeley interviewed either Larkin or Godri for the Audubon position.

[20] Although Larkin asserts in her brief that "[t]here are several reasons the interview process was a sham" and that "[t]he District incorrectly contends that the interrupted interview is

approximately twenty to twenty-five minutes, was interrupted on two separate occasions, each time for several minutes, when someone came into the office in which the interview was being conducted. Larkin asserts that on both occasions, MacGregor and Petino engaged in conversation with the person who entered the office, "ignoring the fact that they were in the middle of conducting an interview." (Compl. ¶ 35.) Larkin testified, however, that, notwithstanding these interruptions, MacGregor and Petino paid attention to her answers and took accurate notes during the interview. (Def.'s Facts ¶ 104; Larkin Dep. at 155:15–158:17.) And there is no evidence that they had anything to do with the interruptions.

Larkin asserts that no one else had been interviewed for the position when she was told that she had not been selected. But again, this does not undermine the District's proffered explanation that MacGregor and Petino thought that she lacked the elementary-school experience that they were looking for and that she did not demonstrate sufficient enthusiasm or energy during the interview.

As to her elementary-school experience, Larkin asserts that MacGregor was mistaken in his belief that she did not have any elementary experience and notes that he testified that his decision might have been different if he had known that she did in fact have some elementary-school experience. But, as discussed above, Larkin cannot survive summary judgment merely by showing that the District's decision was wrong or mistaken. *See Fuentes*, 32 F.3d at 765. Larkin suggests that MacGregor was unaware of her elementary-school experience because Feeley failed to provide MacGregor and Petino with her resume. But Larkin does not contend, or

the only evidence" (Pl.'s Br. at 19), at her deposition she testified that the fact that her interview for the split position was interrupted twice was the only evidence supporting her allegation; in her view, there was no other evidence to support her claim that the interview for the split position was a "sham" (Larkin Dep. at 155:3–14).

otherwise offer any evidence to suggest, that Feeley gave the other candidates' resumes to either MacGregor or Petino. (*Cf.* Gorla Dep. at 13:4–17 (explaining that she did not have a copy of either Larkin's or Godri's resume before the interview and did not review anything else about either candidate before the interview).) Nor does Larkin offer any reason why she could not have brought her resume with her to the interview in case her interviewers did not have a copy of it.[21]

Finally, Larkin points out that she was evaluated on a 74-point scale whereas each of the other five candidates was evaluated on a 64-point scale and asserts that the candidate with the highest score was not selected for the position. But the District has never contended that it hired the candidate with the highest score or that the decision not to hire Larkin was based on her score. And beyond the difference in the numerical scales used, Larkin points to no meaningful difference in the substantive criteria used to evaluate her as compared with the other candidates. MacGregor testified, for example, that the reason he selected Seibert was that he "liked her experience and her experience included several years of elementary experience." (MacGregor Dep. at 41:16–19.) Although no one from the District could explain why a scoring system was used if the interviewers were not required to select the candidate with the highest score—or why a different scale was used for Larkin as compared with the other candidates—this evidence does not demonstrate sufficient "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the District's proffered reason for its hiring decision.

In short, Larkin has not presented sufficient evidence to demonstrate that the District's

---

[21] During her deposition, when she was shown the interview evaluation forms completed by MacGregor and Petino, Larkin seemed to suggest that MacGregor's and Petino's interview notes indicated that they knew that she had some elementary-school experience. (Larkin Dep. at 159:8–160:3.) But Larkin does not claim here that MacGregor actually was aware of her elementary experience; she argues only that MacGregor was mistaken in his belief that she lacked such experience.

proffered explanation for denying her the elementary-school positions was pretextual. I am

mindful of the Third Circuit's admonition that, "[i]n determining the appropriateness of

summary judgment, [a] court should not consider the record solely in piecemeal fashion, giving

credence to innocent explanations for individual strands of evidence, for a jury . . . would be

entitled to view the evidence as a whole." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d

265, 285 (3d Cir. 2001) (internal quotation marks and citation omitted). But even when the

record is taken as a whole, a reasonable jury could not conclude that retaliatory animus was the

determinative factor in the District's decisions.

### 3.      Unsatisfactory Rating

Larkin next claims that the District retaliated against her by giving her an unsatisfactory

rating.

The District argues first that Larkin cannot establish a prima facie case as to this claim

because "an unsatisfactory rating is not an adverse employment action as a matter of law."

(Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br.") at 21.) The District contends that the

unsatisfactory evaluation "did not significantly change [Larkin's] employment status in any

manner" or "cause any change in [her] benefits." (*Id.*)

In *Burlington Northern*, however, the Supreme Court held that "[t]he scope of the

antiretaliation provision extends beyond workplace-related or employment-related retaliatory

acts and harm," 548 U.S. at 67, and "is not limited to . . . actions that affect the terms and

conditions of employment," *id.* at 64.[22] Rather, the relevant standard is whether the challenged

---

[22] Although the Supreme Court addressed Title VII's antiretaliation provision, courts
have applied the Title VII standard to retaliation claims under the ADA. *See, e.g.*, *Mondzelewski
v. Pathmark Stores, Inc.*, 162 F.3d 778, 787 (3d Cir. 1998) (asserting that retaliation analysis
under the ADA follows the Title VII framework).

action is "materially adverse, which in this context means it well might have dissuaded a reasonable worker from [engaging in protected activity]." *Id.* at 68 (internal quotation marks and citations omitted).

Here, Larkin alleges that the unsatisfactory rating affects her "ability to keep or find work." (Larkin Certification ¶ 15.) She asserts that if she "returned to the District and received another unsatisfactory rating [she] would lose [her] teaching certification." (*Id.*) She further asserts that if she "applied for a teaching job in Florida or Pennsylvania [she] would have to disclose [the] unsatisfactory rating" and that "[a]n unsatisfactory rating on [her] record substantially reduces the likelihood that [she] could obtain a teaching job during these difficult times when many teachers without that blemish are also looking for work." (*Id.* ¶ 16.) These allegations, if true, would support an inference that the unsatisfactory rating was materially adverse.

The District argues that it is nonetheless entitled to summary judgment because, assuming for the sake of argument that Larkin has established a prima facie case, the District has offered a legitimate, nonretaliatory reason for its action—namely, that it gave her an unsatisfactory rating because she showed up to school intoxicated—and Larkin has not submitted sufficient evidence to demonstrate that its reason was merely a pretext for retaliation. I agree.

Larkin does not dispute that she deserved an unsatisfactory rating. (Pl.'s Resp. to Def.'s Facts ¶ 42.) Accordingly, to defeat summary judgment, Larkin must, as discussed above, point to evidence from which a jury could reasonably conclude that retaliation was more likely than not a determinative factor in the District's decision to give her an unsatisfactory rating—that is, that

she would not have received the unsatisfactory rating but for her request for a reasonable accommodation and her complaints about the District's handling of her request. *See Woodson*, 109 F.3d at 931–35; *Fuentes*, 32 F.3d at 764.

Larkin claims that shortly after the incident, and before she requested a reasonable accommodation, Stevenson, the District's superintendent, told Kernop, the president of the local teachers' union, that the District would not take any further action against Larkin beyond the four-day suspension. (Kernop Dep. at 35:18–36:19.) According to Kernop, Stevenson said that the February 8 incident would not affect Larkin's rating. (*Id.* at 35:18–36:1.)

Even if this evidence is believed,[23] it is not sufficient to permit a jury to reasonably conclude that retaliation was a determinative cause of the unsatisfactory rating. *Fuentes*, 32 F.3d at 764. The fact that Stevenson may have told Kernop in February that the suspension would be the only action taken against Larkin, or that Larkin was not told that she would receive an unsatisfactory rating in the same letter in which she was informed of her suspension, does not preclude District officials from deciding to give Larkin an unsatisfactory evaluation at the end of the school year, when they completed teacher evaluations—particularly given that Larkin admits that the unsatisfactory rating was warranted and, indeed, that the District could have fired her for showing up at school intoxicated (Larkin Dep. at 58:14–17).

---

[23] Stevenson testified that she did not recall any conversation in which she told Kernop either that Larkin would not be subject to any additional disciplinary action beyond what was described in the February 11 letter or that Larkin's rating would not be affected by the February 8 incident. (Pl.'s Supp'l Facts Ex. 17, at 67:19–68:9.) And a handwritten note on the printout of an e-mail that Kernop sent to Superintendent Quinn, in which Kernop said that Stevenson had told her that neither Larkin's job nor her rating was in "jeopardy," reads: "Barbara [Stevenson] did not recall <u>any</u> discussion about 'rating.' She did say her 'job' was not in jeopardy." (Pl.'s Supp'l Facts Ex. 14, at 2.) Nonetheless, for purposes of the District's summary-judgment motion, I must view the evidence in the light most favorable to Larkin.

More significantly, by the time the District issued Larkin's evaluation, Quinn had replaced Stevenson as District superintendent. According to policy, the superintendent was required to sign any unsatisfactory rating. (Def.'s Mot. for Summ. J. Ex. FF, at 73:8–10.) Quinn testified not only that he signed the evaluation but that he "supported and approved" it. (*Id.* at 73:11–15.) After reviewing information about the February 8 incident and discovering that an evaluation "pertaining to the incident" had not previously been prepared, Quinn concluded that the incident "warranted an evaluation that would be unsatisfactory." (*Id.* at 73:20–77:24.)

There is no evidence in the record that, when he signed the evaluation, Quinn was aware of Stevenson's alleged assurances that the February 8 incident would not affect Larkin's rating. Indeed, Kernop testified that she sent him an e-mail on July 5 (after he had signed Larkin's evaluation) "to give him the history of what had happened in case he didn't have the full history." (Kernop Dep. at 44:10–16.) She testified that she "was giving him information that [she] didn't think he had"' and that she knew, for example, that "he was not aware of the April 23rd meeting." (*Id.* at 44:21–24.) And in addition to discussing the April 23 meeting in her e-mail to Quinn, Kernop informed him of the assurances she had received from Stevenson regarding Larkin's job and rating. (Pl.'s Supp'l Facts Ex. 14, at 2.)

Although this is a close question, I conclude that, even when the evidence is viewed in the light most favorable to Larkin, it is not sufficient to permit a jury to reasonably conclude that retaliatory animus was a determinative factor in the District's decision to give her an unsatisfactory rating.

### 4. FMLA Leave

Larkin also claims that the District retaliated against her by initially failing to grant her FMLA leave. This claim, however, lacks merit because Larkin has failed to demonstrate any adverse action.

Responding to Larkin's inquiries about FMLA leave, Robert Harney, who had succeeded Feeley as director of labor relations and human resources on July 1, initially told Larkin that she had not satisfied the FMLA eligibility requirements and thus would not be entitled to FMLA leave. After Kernop told him that the teachers' union disagreed with the District's interpretation of the FMLA and the conclusion that the District had reached regarding Larkin's eligibility for FMLA, Harney immediately acknowledged his mistake and clarified the District's position regarding Larkin's eligibility. And the District ultimately granted Larkin's request for FMLA leave. Nonetheless, Larkin contends that the District's initial denial of FMLA leave constitutes an adverse action because the District granted her request only after the union pointed out the District's mistake.

"The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N.*, 548 U.S. at 67. Larkin, however, has not demonstrated any injury or harm resulting from the District's conduct. Harney immediately corrected himself when Kernop pointed out his mistake, and the District ultimately granted her FMLA leave when she applied for it. There is no evidence that Harney's initial conclusion was anything but a good-faith mistake. But even if Harney had not been acting in good faith, there is simply nothing in the record that would suggest that Larkin was harmed in any way.

The situation here is not like that in *Burlington Northern*, in which the Supreme Court

upheld as reasonable the jury's conclusion that a 37-day suspension without pay was materially adverse, even though the company ultimately reinstated the plaintiff with backpay, because the plaintiff "and her family had to live for 37 days without income" and without "know[ing] during that time whether or when [the plaintiff] could return to work." 548 U.S. at 72–73 (concluding that "an indefinite suspension without pay could well act as a deterrent [to filing a discrimination claim], even if the suspended employee eventually received backpay"). There is no indication here that Larkin was unable to take the leave she required or that she suffered any economic harm from the District's initial mistake.

### 5. Other Actions

Finally, Larkin claims that the District engaged in retaliatory harassment by "wrongfully accusing her of not providing the results of her blood test," by "insisting that she return to the high school despite medical advice to the contrary," and by "accusing her of not participating in the interactive process." (Pl.'s Br. at 23.) None of these actions, however, either alone or taken together, is sufficient to sustain a claim of retaliation.

Larkin contends that the District wrongly accused her of failing to provide the results of her blood-alcohol test. She points to an e-mail from Harney in which he said that she had been "asked repeatedly" to provide the results since February and that she had "offered no reasonable basis for not doing so" (Pl.'s Supp'l Facts Ex. 37, E-mail from Robert Harney to Deborah Larkin (July 17, 2008, 1:02 p.m.)), even though, as Harney later testified, he "could not identify a single request made by the District after February 11" (Pl.'s Br. at 23). Larkin further asserts that Harney made these "unsupported statements" notwithstanding her earlier "plea for understanding" in which she explained that "the District's actions were making her recovery

more difficult." (Pl.'s Br. at 23.)

Larkin may genuinely have found such accusations and the tone of Harney's e-mail distressing. But in determining whether alleged retaliatory conduct constitutes an "adverse action" within the meaning of the ADA's antiretaliation provision, courts must employ an objective standard—the question is whether "a reasonable employee [in the plaintiff's position] would have found [Harney's accusations] materially adverse." *Burlington N.*, 548 U.S. at 68 ("We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective."). Moreover, "[i]n evaluating whether actions are materially adverse, [a court] must remain mindful that 'it is important to separate significant from trivial harms' because '[a]n employee's decision to [engage in protected activity] cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.'" *Moore v. City of Philadelphia*, 461 F.3d 331, 346 (3d Cir. 2006) (quoting *Burlington N.*, 548 U.S. at 68). Here, neither Harney's accusations nor his e-mail exchange with Larkin rises to the level of a "materially adverse" action that might "dissuade a reasonable worker from [engaging in protected activity]." *Burlington N.*, 548 U.S. at 57.

Larkin's contention that the District insisted that she return to her teaching position at the high school despite medical advice to the contrary is essentially another way of saying that the District refused to provide a reasonable accommodation. And as discussed above, the District cannot be held liable under the ADA's antiretaliation provision simply for failing to accommodate Larkin. Larkin has offered no evidence that would suggest that the District's insistence that she return to the high school rose to the level of harassment.

Nor may the District's accusation that Larkin herself failed to engage in the interactive process properly be considered retaliatory harassment. The District made this assertion in its brief supporting its motion for summary judgment (*see* Def.'s Br. at 15 n.6 ("Even if this Court does consider the Plaintiff to have a disability under the ADA, the District submits that Ms. Larkin's claim must fail because she refused to engage in a true interactive process with the District.")), and such a statement simply does not constitute retaliation.

* * *

Some of the conduct that Larkin has challenged as retaliatory is not, as a matter of law, the type of "materially adverse" conduct that will sustain a claim of retaliation. And with respect to those challenged actions that are materially adverse, Larkin has failed to present sufficient evidence from which a jury could reasonably conclude that retaliatory animus was a determinative cause of the District's actions. Accordingly, I will grant the District's motion for summary judgment as to Larkin's retaliation claim.

## IV.    CONCLUSION

For the reasons set forth above, I will grant the District's motion for summary judgment as to each of Larkin's claims. An appropriate order accompanies this memorandum.